Fleming v. Horner, 2022 NCBC 26.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

PETER FLEMING,

Plaintiff,

v.

ADAM HORNER and HAMILTON,
STEPHENS, STEELE + MARTIN,
PLLC,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 3348

**ORDER AND OPINION ON
DEFENDANTS' REFILED MOTION
FOR SUMMARY JUDGMENT**

1.     This matter is before the Court on Defendants' Refiled Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("the Motion")(ECF No. 72).

2.     For the reasons set forth herein, the Court **GRANTS** the Motion.

*Rabon Law Firm, PLLC by Charles H. Rabon and Bland Richter, LLP by Ronald L. Richter and Eric Steven Bland for Plaintiff Peter Fleming.*

*Cranfill Sumner & Hartzog LLP by Ryan Dale Bolick and Melody J. Jolly for Defendants Adam Horner and Hamilton, Stephens, Steele + Martin, PLLC.*

Robinson, Judge.

## I.     INTRODUCTION

3.     Plaintiff Peter Fleming ("Fleming") engaged Defendant Adam Horner ("Horner") and Horner's former law firm, Hamilton, Stephens, Steele + Martin, PLLC ("HSSM") (collectively, the "Defendants"), to represent Fleming in an underlying lawsuit that included claims for breach of fiduciary duty, constructive fraud,

constructive fraudulent transfer, and unfair and deceptive trade practices. The Complaint alleged personal liability on the part of Fleming. Following a sizeable verdict against him, Fleming brings this action against Horner and HSSM alleging legal malpractice and seeking relief in the form of compensatory and punitive damages.

## II.    FACTUAL BACKGROUND

4.    The Court does not make findings of fact when ruling on motions for summary judgment. However, "to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

### A.    Events Preceding the Underlying Action

5.    Fleming engaged in the business of insurance through WFT, Inc. ("WFT"), a corporate entity he owned and controlled. (Compl. ¶ 5.)

6.    In 2005, WFT entered into an agreement with General Fidelity Insurance Company ("GFIC"), whereupon GFIC would reinsure insurance policies underwritten by WFT. (Compl. ¶¶ 7–8.)

7.    On 24 July 2009, GFIC terminated the agreement with WFT. (Compl. 10.)

8.    On 10 June 2010, GFIC initiated arbitration proceedings in Texas against WFT (the "Arbitration") related to WFT's financial obligations to GFIC. (Ans. Ex. 2 ["GFIC Compl."] ¶¶ 10–11.)

9. Sometime in 2010, WFT stopped writing insurance policies and began the process of winding up its affairs. (Defs'. Br. Supp. Summ. J. ["Defs'. Br."] Ex. G, ECF No. 73.7 ["Fleming 2021 Dep."] 267.)

10. On 17 November 2011, Fleming formed a corporate entity named Blessmatch Marine Insurance Services, Inc. ("BMI") for the sole purpose of continuing WFT's business under a new name and identity. (Compl. ¶ 19.) Continuing WFT's business was difficult because the relationship between WFT and GFIC had soured, and the arbitration was ongoing. (Fleming 2021 Dep. 62–63.)

11. To assist with the formation of BMI, Fleming retained K&L Gates LLP ("K&L") to provide legal services and Grant Thornton LLP ("GT") to provide accounting services. (Compl. ¶ 20.)

12. With help from K&L and GT, Fleming created BMI and was its sole owner. He restructured WFT as a wholly owned subsidiary of BMI. (Plt's. Br. Opp. Summ. J. ["Plt's. Br."] Ex. 11, ECF No. 75.11.)

13. Meanwhile, WFT was represented in the Arbitration by Texas counsel. The Arbitration proceedings concluded on 2 August 2013. (Compl. ¶ 25.) The result was an award in favor of GFIC in excess of $2.5 million. A Texas state court subsequently entered judgment in favor of GFIC on the award in the total amount of $2,653,552.58 (the "Texas Judgment"). (Compl. ¶ 26.)

14. From 2010, when WFT began winding up, through 2013, when the Texas Judgment was entered, Fleming received a salary from WFT totaling $2,267,911. (Defs'. Br. Ex. K, ECF No. 73.11 ["Pasq. Aff."] 2, 7–8.) The salary was paid to Fleming

either from WFT assets directly or through an offshore entity named WFT London. (Pasq. Aff. 7–8.)

15.     In addition, from 2010 through 2013, WFT paid Fleming $1,047,781.03 for charges on his personal credit cards, his country club dues, and in miscellaneous transfers that were wired to Fleming. (Pasq. Aff. 2, 7, 10–14.)

16.     From 2008 through 2011, WFT made personal loans to Fleming in the total amount of $1,890,159 that were not repaid. Fleming claimed some of the money as income on his personal tax returns. (Pasq. Aff. 26–27; Defs'. Br. Ex. L, ECF No. 73.14 ["Hylton Aff."] ¶¶ 6–9.)

### B.     The Underlying Action: Initiation through Summary Judgment

17.     On 15 May 2014 GFIC filed suit against WFT (the "Underlying Action") in Mecklenburg County, North Carolina, seeking to domesticate the $2,653,552.58 Texas Judgment. (Compl. ¶¶ 26, 28.)

18.     GFIC also sought damages against WFT, BMI, Alpha Marine Underwriters, Inc.,[1] and Fleming, individually, alleging claims for constructive fraud, breach of fiduciary duty, constructive fraudulent transfer, civil conspiracy, facilitation of fraud and unfair and deceptive trade practices. (Compl. 28.)

19.     Initially, Fleming did not retain HSSM to represent him in the Underlying Action. (Fleming 2021 Dep. 88.) However, after discovery began, GFIC moved to compel responses to discovery. (See Defs'. Br., Ex. D; ECF No. 73.4 ["Defs'. Ex. D"] 1.) The trial court ordered Fleming and the corporate defendants to comply with

---

[1] Although Alpha Marine Underwriters, Inc. was named in the Underlying Action, all transactions relevant to the instant case are between WFT, BMI, and Fleming.

GFIC's discovery requests and pay GFIC's reasonable attorneys' fees. (Defs'. Ex. D 8.)

20. Thereafter, on 25 August 2015 Fleming terminated his counsel and hired Horner and HSSM to represent all defendants in the Underlying Action. (Compl. ¶ 38.)

21. Almost a year later, on 2 August 2016 Horner and HSSM withdrew as counsel in the Underlying Action for the stated reason that Fleming was no longer paying for their services. (Defs'. Br. Ex. F, ECF No. 73.6 76–80.) Fleming and the corporate defendants then proceeded without counsel in the Underlying Action until July 2017 when GFIC filed a motion for summary judgment on all claims. (Compl. ¶¶ 57–58.)

22. At Fleming's request, Horner and HSSM agreed to resume representation of Horner and the corporate defendants in the Underlying Action for the limited purpose of opposing the summary judgment motion. (Compl. ¶ 60.)

23. The first hearing on the summary judgment motion was scheduled for 15 August 2017. (Plt's. Br. Ex. 28, ECF No. 75.28.) Defendants filed no affidavits, briefs, or documents in opposition to GFIC's motion. Laura Barringer ("Barringer"), an associate attorney with HSSM, appeared at the hearing on Fleming and the corporate defendants' behalf. (Plt's. Br. Ex. 31, ECF No. 75.31.)

24. On 14 September 2017, the judge presiding over the hearing emailed counsel to schedule a second hearing on the underlying motion for summary judgment. (Plt's. Br. Ex. 37, ECF No. 75.37 ["J. Levinson's email"].) In the email, the

court acknowledged that there "was comparatively little case/litigation activity in the weeks leading into the [summary judgment] motion and hearing" and that under the circumstances "Mr. Horner's office should have filed a motion to continue." (J. Levinson's email.) The court admonished HSSM saying: "[t]his is not like Mr. Horner's firm to be unprepared for a hearing." (J. Levinson's email.)

25. The second hearing on the summary judgment motion was scheduled for 13 November 2017. (Plt's. Br. Ex. 43, ECF No. 75.43.) Rebecca Cheney ("Cheney"), another attorney employed by HSSM, was tasked with representing Fleming and the corporate defendants because Horner and Barringer were separating from HSSM. (Plt's. Br. Ex. 39, ECF No. 75.39.)

26. Like the attorneys before her, Cheney submitted no affidavits, documents, or materials to the trial court on Fleming and the corporate defendants' behalf prior to the second hearing on the motion for summary judgment. (Plt's Br. Ex. 25, ECF No. 81.2["Cheney Dep."] 201.)

27. On 12 January 2018, the court granted partial summary judgment in favor of GFIC. The trial court determined that Fleming was jointly and severally liable with the corporate defendants on GFIC's claims for breach of fiduciary duty, constructive fraud, and constructive fraudulent transfer. As a result, judgment was entered against Fleming and the corporate defendants in the total amount of $3,180,264.59. (Plt's. Br. Ex. 45, ECF No. 75.45 ["2018 Summ. J. Order"] 2.)

28. The trial court denied GFIC's motion for summary judgment as to the claim of unfair and deceptive trade practices and set that claim for trial. It granted

summary judgment in favor of Fleming and the corporate defendants for the claims of civil conspiracy and facilitation of fraud. (2018 Summ. J. Order 2.)

### C. The Underlying Action: Trial and Subsequent Appeal

29. After the trial court's ruling granting partial summary judgment in GFIC's favor, Fleming terminated Cheney and HSSM and hired another law firm to defend against GFIC's remaining claim for unfair and deceptive trade practices. (Cheney Dep. 75, 214–217.)

30. Fleming contended that the issue of his personal liability had already been litigated during the Arbitration, resulting in a determination in his favor on the issue. He told his successor attorneys that Horner and HSSM had failed to argue claim preclusion and collateral estoppel during the summary judgment hearings. (Defs'. Br. Ex. I, ECF No. 73.9 ["Lincoln Dep."] 24–25, 107, 201.)

31. However, his successor attorneys did not find support for claim preclusion or collateral estoppel in the record from the Arbitration and, therefore, decided not to file a motion for relief from the judgment under Rule 60 of the North Carolina Rules of Civil Procedure. (Lincoln Dep. 80, 97–98.)

32. On 12 February 2018, counsel for Fleming and the corporate defendants appeared at a bench trial on the issue of GFIC's remaining unfair and deceptive trade practices claim. (Compl. ¶ 108.) Fleming's counsel argued that GFIC's claims did not affect commerce, a necessary element of the claim. (Lincoln Dep. 63–65.)

33. At the conclusion of the bench trial, the trial court ruled in favor of GFIC and then trebled the damage award. Fleming and the corporate defendants were determined to be jointly and severally liable for $12,849,193.20. (Compl. 110.)

34. Fleming and the corporate defendants in the underlying action appealed the judgments entered against them. The North Carolina Court of Appeals subsequently affirmed. *See Gen. Fid. Ins. Co. v. WFT, Inc.*, 269 N.C. App. 181 (2020).

### D. Fleming's Legal Malpractice Claim

35. In the instant case, Fleming alleges that Horner and HSSM's negligent legal representation of him in the Underlying Action caused the $12,849,193.20 judgment for which he is personally liable. (Compl. ¶¶ 114–15.)

36. Fleming alleges that Defendants breached the duties that they owed him by, *inter alia*, failing to adequately research and prepare arguments in Fleming's defense in opposition to the summary judgment motion, failing to plead collateral estoppel or claim preclusion based on GFIC's claims made in the Arbitration proceeding, failing to present evidence in the Underlying Action that Fleming relied on professional advice during the restructuring of WFT and founding of BMI, and failing to provide adequate supervision of Barringer as a less experienced associate attorney. (Compl. ¶ 113.)

37. Fleming seeks actual damages from Defendants based upon their alleged negligence, as well as punitive damages pursuant to N.C.G.S. § 1D-1. (Compl. 16.)

## III.   PROCEDURAL BACKGROUND

38. The Complaint was filed on 24 February 2020. (ECF No. 12.)

39. After discovery, Defendants filed their Motion for Summary Judgment and supporting brief on 15 November 2021. (ECF Nos. 59, 60.) Fleming filed a response on 15 December 2021, (ECF No. 65), and Defendants replied on 28 December 2021, (ECF No. 68).

40. On 13 January 2022 the Court held a hearing on the Motion. However, the parties' failure to comply with the requirements for the proper submission of exhibits supporting and opposing summary judgment resulted in an Order issued by the Court on 26 January 2022 requiring them to refile their materials, (ECF No. 71).

41. On 27 January 2022 Defendants refiled the Motion, (ECF No. 72), along with an index of exhibits, (ECF No. 73), and on 1 February 2022 Defendants refiled their brief with citation to the exhibits, (ECF No. 74).

42. On 9 March 2022, Fleming filed his index of exhibits, (ECF No. 75), as well as his brief with citation to the exhibits, (ECF No. 76). Fleming's brief was filed provisionally under seal and refiled publicly on 25 April 2022. (ECF No. 81.1.)

43. On 10 March 2022, Defendants refiled their reply brief, (ECF No. 79), as well as another index of exhibits, (ECF No. 77).

44. Having received compliant briefs and exhibits in support of and in opposition to the Motion, and after considering the arguments of counsel at the hearing on the Motion, the Motion is now ripe for resolution.

## IV.  LEGAL STANDARD

45. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83 (2000).

46. The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563 (2008). The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83 (citations omitted).

47. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

48. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83. However, the nonmovant "may not rest upon the mere allegations or denials of their pleading, but their response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment,

if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

## V. ANALYSIS

### A. The "Case Within a Case"

49. For a legal malpractice claim, a plaintiff must prove three elements by the greater weight of evidence: (1) that the attorney breached the duties owed to his client; (2) the attorney's breach proximately caused damage to plaintiff; and (3) the amount of plaintiff's damages. *Rorrer v. Cooke*, 313 N.C. 338, 355 (1985).

50. Here, Defendants claim that Fleming cannot satisfy the proximate cause element of his legal malpractice claim. They seek summary judgment on the grounds that, even if Defendants had properly represented Plaintiff, he would have lost the Underlying Action.

51. In response to the Motion, the plaintiff must come forward with sufficient evidence that he would have prevailed in the underlying action to create a triable issue of fact. *Kearns v. Horsley*, 144 N.C. App. 200, 203, 211 (2001).

52. This is true even if the attorney's actions during the underlying case resulted in the merits never being adjudicated. *Id.* at 211–12. Thus, the plaintiff must present evidence to the factfinder in support of the underlying claim and the defendant attorney may present evidence in opposition to the underlying claim. *Hummer v. Pulley, Watson, King & Lischer, P.A.*, 157 N.C. App. 60, 66–67 (2003) (internal citation omitted).

53. The Court is not limited to considering only the evidence and arguments that were actually presented during in the Underlying Action. Rather, to evaluate proximate cause, the Court may consider any evidence with respect to the merits of GFIC's underlying claims against Fleming to determine whether Fleming would have ultimately prevailed in the underlying proceedings. *See Kearns*, 144 N.C. App. at 211–12 (holding that a legal malpractice plaintiff has the burden to prove they would have been successful in the underlying action, even when the underlying action was never filed).

54. If the Court finds that Plaintiff would have lost the Underlying Action even if he had been "properly" represented, proximate cause is defeated, and the malpractice claim fails as a matter of law. Accordingly, the Court examines each claim resulting in the judgment against Fleming to determine, based on the record in the instant case, whether Fleming could have prevailed on any underlying claim, such that there is a triable issue of fact with respect to the element of proximate cause.

## B. Piercing the Corporate Veil

55. Central to Fleming's legal malpractice claim is the trial court's decision to grant GFIC's motion to pierce the corporate veil resulting in his personal liability for the arbitration judgment against WFT. In determining whether to pierce the corporate veil and hold a shareholder or director of a corporation personally liable to the corporation's creditors, North Carolina applies the "instrumentality rule." *See Acceptance Corp. v. Spencer*, 268 N.C. 1, 8 (1966).

56.     Pursuant to the instrumentality rule, a plaintiff is required to prove three elements: first, complete domination over a company such that it has no separate mind from the defendant; second, that the domination has been used to commit a fraud or wrong against the plaintiff; and third, that the fraud or wrong caused injury or unjust loss to the plaintiff. *Glenn v. Wagner*, 313 N.C. 450, 455 (1985).

57.     Four factors bear on whether the three prongs of the instrumentality rule are satisfied: inadequate capitalization, lack of compliance with corporate formalities, complete domination and control of the corporation such that it has no independent identity, and excessive fragmentation. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 578 (2013).

58.     In the Underlying Action, the Court of Appeals affirmed the trial court's decision to pierce the corporate veil because it concluded that WFT and BMI had no separate identity from Fleming or each other. *Gen. Fid. Ins. Co.*, 269 N.C. App. at 190. Because Fleming had sole authority to transfer funds and assets from WFT, and because Fleming was found liable for constructive fraud and constructive fraudulent transfer (*see infra*), the Court of Appeals held that all three prongs of the instrumentality rule were met. *Id. See also Hamby v. Thurman Timber Co.*, 260 N.C. App. 357, 364 (2018) (holding that a showing of constructive fraud or fraudulent transfer is sufficient to satisfy the second and third prongs of the instrumentality rule).

59.     In the instant case, Defendants argue that Fleming's complete domination over WFT and BMI is undisputed. (Defs'. Br. 19–20.) Defendants point to evidence

demonstrating the lack of board oversight with respect to Fleming's decision to transfer assets from WFT to BMI and to himself. (Defs'. Br. 20; Hylton Aff. ¶ 12(b)–(c).) Defendants also cite Fleming's own testimony as evidence that Fleming failed to distinguish WFT and BMI's assets as separate from his own. (Defs' Br. 20; Hylton Aff. ¶ 12(e); Fleming 2021 Dep. 63–64.)

60. In Defendants' view, if the Court finds Fleming liable for constructive fraud or fraudulent transfer as a matter of law, then given Fleming's domination over WFT the instrumentality rule is also satisfied as a matter of law, and the corporate veil must be disregarded.

61. Fleming offers two reasons[2] why piercing the corporate veil was improper at the summary judgment stage of the Underlying Action and, therefore, why Defendants failed to represent him adequately.

62. First, because he relied upon professional advice during the restructuring of WFT and when all relevant transfers of WFT's assets were made, Fleming argues that he is statutorily shielded from personal liability under N.C.G.S. § 55-8-30(b) and (d). (Plt's. Br. 19–20.)

63. Second, Fleming argues that the testimony of his administrative assistant Gina Eckl ("Eckl") demonstrates that he did not dominate WFT, that the company observed corporate formalities, and that he had no intent to defraud GFIC. (Plt's. Br.

---

[2] In addition to the arguments made in his brief in opposition to Defendants' summary judgment motion, Fleming's Complaint raises the doctrines of claim preclusion and issue preclusion as defenses that, had they been raised by Defendants, would have prevented veil piercing. (Compl. ¶¶ 48, 113(b).) Fleming is deemed to have waived this argument through his failure to properly raise and argue it in his brief.

25–26.) In Fleming's view, if testimony from both professional consultants whom Fleming relied upon—i.e., K&L Gates and GT—and testimony from Eckl had been presented by Defendants as evidence during the Underlying Action, a triable issue of fact would have existed, and summary judgment would not have been entered against him.

64. The Court finds Fleming's arguments unavailing. His first argument, that his conduct was based on advice of his attorneys and accountants, is simply not supported by the facts. In addition, his argument is defeated by the very statute on which he relies. N.C.G.S. § 55-8-30(b) provides: "a director is entitled to rely on information, opinions, reports, or statements . . . if prepared or presented by any of the following . . . . legal counsel, public accountants, or other persons as to matters the director reasonably believes are within their professional or expert competence." N.C.G.S. § 55-8-30(b)(ii). However, N.C.G.S. § 55-8-30(c) also provides that a director is "not entitled to the benefit of subsection (b) of this section if the director has actual knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (b) of this section unwarranted." It is undisputed that neither K&L Gates nor GT were informed by Fleming that WFT had ceased business and was winding up at the time Fleming engaged them, nor at any time afterwards. Moreover, they were not aware that GFIC was a known creditor to whom Fleming, as a director of WFT, owed a fiduciary duty. (*See* Defs'. Br. Ex. M, ECF No. 73.15 ["Doolittle Dep."] 60–63; Defs'. Br. Ex. N, ECF No. 73.16 ["Webb Dep."] 28, 86, 180–183.) Had GT known these facts, GT would have advised Fleming to satisfy creditors

rather than make distributions to himself. (Webb Dep. 121–123, 180–186.) The protections of N.C.G.S. § 55-8-30(b) do not apply when a director does not apprise his advisors of essential, relevant information. Therefore, Fleming's first argument fails.

65. Fleming next argues that Defendants failed to elicit testimony from his administrative assistant Eckl. As a preliminary matter, Plaintiff must prove that he ultimately would have been successful in the underlying action, not merely that he would have defeated GFIC's motion for summary judgment if an affidavit from Ms. Eckl had been submitted to the Court. *See supra* ¶ 53; *see also Kearns*, 144 N.C. App. at 211–12. Therefore, Fleming's argument that Eckl's testimony could have created a dispute of fact misses the mark. *Id.*

66. In any event, the Court disagrees that Eckl's testimony creates a triable issue of fact, much less that Eckl's testimony would have resulted in Fleming being ultimately successful. According to Fleming, Eckl "could have and would have" testified that WFT operated with an independent board of directors – proof that he did not completely dominate WFT. (Plt's. Br. 25; Plt's. Br. Ex. 35, ECF No. 75.35 ["Eckl Dep."] 136.) But even so, this argument is defeated by the fact that there was no board approval, or even discussion, of the payments and transfers made from WFT to Fleming. (Hylton Aff. ¶ 12(b).) The mere fact that there were other directors does not mean that Fleming did not exercise complete control over WFT's affairs, and nothing in Eckl's testimony speaks to the contrary.

67. Fleming argues that Eckl's testimony would have bolstered his argument that his reliance on professionals shields him from personal liability. (Plt's. Br. 26;

Eckl Dep. 137–38.) As stated above, Fleming did not apprise the professionals of relevant information. Eckl's testimony merely reiterates that Fleming hired K&L Gates and GT, but it does provide Fleming the support he seeks.

68. Fleming argues that Eckl could attest that WFT enlisted the advice of the Finley Group to assist with the wind up of WFT's affairs. (Plt's Br. 26; Eckl Dep. 138.) But any advice the Finley Group may have rendered is irrelevant because it was not hired until 2012. (Plt's. Br. 23.) By then, WFT had been in wind-up for at least two years, and during those two years, Fleming had already transferred millions of dollars from WFT to himself. (Pasq. Aff. 7.) Indeed, by the time the Finley Group was engaged, WFT lacked sufficient assets to satisfy GFIC's arbitration award and the Texas Judgment. Consequently, this testimony, even had it been offered, would not have made a difference.

69. Fleming alleges that Eckl's testimony would have reflected that Eckl "was unaware of any facts to support a contention that Fleming sought to defraud creditors." (Plt's. Br. 26; Eckl Dep. 139.) But Eckl's lack of awareness does not change the facts, and it is not necessary to establish Fleming's intent to prove the underlying claims of constructive fraud and constructive fraudulent transfer. (*See infra* ¶ 89.) Thus, none of Fleming's arguments regarding the import of Eckl's testimony to his defense have merit.

70. Having determined that the "missing" evidence identified by Fleming would not have changed the result, the Court finds that Fleming had complete control and domination over the decisions made by WFT, and the undisputed evidence shows that

he caused WFT to transfer to himself or for his benefit millions of dollars in WFT funds during its wind up period. The first element of the instrumentality rule was met.

71.    As the Court of Appeals held in the Underlying Action, liability to a plaintiff for constructive fraud, breach of fiduciary duty, or constructive fraudulent transfer suffices to satisfy the second and third prongs of the instrumentality rule. *Gen. Fid. Ins. Co.*, 269 N.C. App. at 189–190. Therefore, the Court's subsequent analysis focuses on these claims against Fleming to determine whether malpractice played a role in the determination that he was personally liable.

## C.    Breach of Fiduciary Duty and Constructive Fraud

72.    In North Carolina, a corporate director has a fiduciary duty to creditors "under circumstances amounting to a winding-up or dissolution of the corporation." *Keener Lumber Co. v. Perry*, 149 N.C. App. 19, 31 (2002).

73.    A claim of constructive fraud exists when a plaintiff establishes that the defendant director owed a fiduciary duty to the plaintiff, and transactions took place in which the defendant took advantage of his position of trust. *Trillium Ridge Condo Ass'n v. Trillium Links & Vill., LLC*, 236 N.C. App. 478, 502 (2014). Unlike actual fraud, proof of a director's intent to deceive is not necessary to demonstrate constructive fraud. *Link v. Link*, 278 N.C. 181, 192 (1971).

74.    The Court of Appeals affirmed the trial court's award of summary judgment against Fleming on the claims for both breach of fiduciary duty and constructive fraud. *Gen. Fid. Ins. Co.*, 269 N.C. App. at 187. The Court's analysis, however, was

necessarily limited to the record in the Underlying Action. As a result, the Court held that WFT was implicitly winding up because it was insolvent at the time BMI was formed, and that GFIC was a creditor at least as early as 2012. *Id.* Therefore, the Court determined that a fiduciary relationship existed between GFIC and Fleming as a director of WFT. *Id.*

75. Having found a fiduciary duty, the Court of Appeals held that fund transfers from WFT to BMI and from WFT to Fleming personally benefitted Fleming and constituted constructive fraud. *Id.*

76. The record in the instant case includes Fleming's admission that WFT was in wind-up as early as 2010, and at least by the time the Arbitration began that same year, he understood that GFIC was a creditor. (Fleming 2021 Dep. 27–28, 63–64, 149, 252; Hylton Dep. ¶ 5.) Hence, there is no dispute regarding the existence of a fiduciary duty by Fleming to GFIC beginning in 2010. It is further undisputed that Fleming diverted WFT's assets to his own use and to the detriment of WFT's creditor, GFIC, thereby committing constructive fraud as a matter of law.

77. The record reflects transactions between WFT and Fleming beginning in 2010 that circumvent GFIC's rights as a creditor and benefit Fleming personally. At a time where Fleming should have been reducing his compensation in response to WFT obligations to GFIC, (*see* Hylton Aff. ¶¶ 6–9), Fleming instead paid himself hundreds of thousands of dollars in salary each year, (*see* Pasq. Aff. 7). For the Court of Appeals, this fact alone was enough to find constructive fraud as a matter of law.

*Gen. Fid. Ins. Co.*, 269 N.C. App. at 187. However, the record in this case reveals that Fleming's salary was the proverbial "tip of the iceberg" relative to his self-dealing.

78. Fleming paid himself a second salary by directing funds from WFT to "WFT London," an offshore company he owned. (Pasq. Aff. 2, 7, 9; Hylton Aff. ¶¶ 8–9.) From 2010 through 2012, Fleming directed several hundred thousand dollars from WFT to WFT London without receiving services to WFT in return. (Hylton Aff. ¶¶ 8–9.)

79. Additionally, from 2010 through 2013, Fleming caused WFT to pay several hundred thousand dollars' worth of Fleming's personal credit card bills, and over one hundred thousand dollars' worth of Fleming's country club dues. (Pasq. Aff. 2, 7, 10–14; Hylton Aff. ¶¶ 8–9.) From 2013 through 2014, Fleming also caused WFT to write checks and send wires to him for funds totaling $37,190.03, with no business justification. (Pasq. Aff. 2,7, 10–14, 22–25; Hylton Aff. ¶¶ 8–9.) Finally, Fleming borrowed over 1.8 million dollars from WFT, the bulk of which was taken out after 2010, and he neither repaid the loan nor declared the money as a distribution to himself before shutting WFT and BMI's doors. (Pasq. Aff. 2, 7, 26–27; Hylton Aff. ¶¶ 8–9.)

80. None of the foregoing facts are disputed by Fleming. Fleming's sole argument is that he relied on advice from legal and accounting professionals. However, as previously discussed (*see supra* ¶¶ 64, 67), the record is clear that Fleming did not provide K&L and GT accurate information regarding the fact that WFT was in windup or that GFIC was owed over two million dollars. Had Fleming made these professionals aware of these relevant facts, the record is undisputed that

they would not have advised Fleming to make distributions to himself leaving WFT and BMI unable to satisfy their debts to GFIC. Consequently, nothing offered by Fleming would have changed the determination that he engaged in constructive fraud, and this determination satisfies the second and third prongs of the instrumentality rule resulting in Fleming's personal liability.

### D. Constructive Fraudulent Transfer

81. By statute, a constructive fraudulent transfer is "[a] transfer made or obligation incurred by a debtor [that] is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." N.C.G.S. § 39-23.5(a)(2017).

82. In evaluating a claim of constructive fraudulent transfer, the Court must examine whether the transaction in question resulted in a net loss to the debtor company. N.C.G.S. § 39-23.7(a)(1), (b). This in turn requires a determination whether the element of the debtor not receiving reasonably equivalent value for the transaction is met. *Estate of Hurst v. Jones*, 230 N.C. App. 162, 169 (2013).

83. In the Underlying Action, the Court of Appeals affirmed the trial court's ruling of summary judgment against Fleming for constructive fraudulent transfer. The Court of Appeals held that there was no genuine material dispute over GFIC's status as a creditor, WFT's insolvency at the time, and WFT's transfer of assets to

BMI resulting in a net loss to the company at GFIC's expense. *Gen. Fid. Ins. Co.*, 269 N.C. App. at 188.

84. In the instant case, Defendants argue that the reasoning and force of the Court of Appeals' holding is bolstered by the record reflecting a multitude of transfers from WFT during the relevant period -- not just to BMI but also to Fleming personally. In Defendants' view, "each and every transfer as identified [within Defendants' brief] made for a reason other than for the legitimate purpose of winding up the business or paying WFT's debts . . . is a constructive fraudulent transfer for which [Fleming] is personally liable." (Defs'. Br. 28.) The Court agrees.

85. Once again, Fleming fails to present evidence creating a genuine issue of material fact. The same facts that demonstrate constructive fraud also constitute constructive fraudulent transfer. Fleming admits that WFT was in wind-up due to insolvency in 2010, and that WFT owed GFIC at least as much as the amount of the Arbitration award.[3] Nevertheless, between 2010 and 2013, Fleming transferred millions of dollars to himself or for his personal benefit.

86. In Fleming's view, the underlying claim of constructive fraudulent transfer must fail because "the 'transfer' that formed the basis of GFIC's complaint was the alleged transfer by WFT to [BMI] of all of its assets . . . a transfer that never occurred." (Plt's. Br. 21.) But Fleming ignores the fact that GFIC's claim of constructive fraudulent transfer in the Underlying Action alleged that WFT fraudulently

---

[3] Interestingly, Fleming characterized the Texas arbitration judgment in favor of GFIC and against WFT in excess of $2 million dollars as a "win" because he knew GFIC was owed at least that much or more at the inception of the arbitration in 2010. (*See* Fleming 2021 Dep. 27–28.)

transferred assets to both BMI and Fleming. (Ans. Ex. 2. ¶ 56.) He fails to acknowledge the undisputed fact that millions of dollars in assets and funds were transferred from WFT directly to Fleming personally or to third parties to satisfy his personal debts without value to WFT.

87. Further, Fleming's argument also fails to acknowledge that this Court is not limited to the record in the Underlying Action, but instead may consider all facts in the instant record. Therefore, even if the trial court and the Court of Appeals in the Underlying Action focused on WFT's transfer to BMI, this Court need not confine its analysis to those facts. And there is an abundance of undisputed evidence that Fleming caused WFT to transfer millions of dollars to himself.

88. In summary, the evidence in the record—including Fleming's own testimony and the testimony of representatives from the professionals whose advice he sought—only serves to bolster the trial court's judgment in favor of GFIC in the Underlying Action. Without evidence to support a path to victory, the Court finds that nothing the Defendants could have done would have changed this result. Accordingly, absent evidence of proximate cause, the Court GRANTS Defendants' motion for summary judgment with respect to Fleming's claim for legal malpractice.

### E. Unfair and Deceptive Trade Practices

89. Fleming claims that Defendants' alleged negligence proximately caused the trial court to enter judgment against him on the Chapter 75 claim and then to treble the damages. Fleming argues that the only reason the trial court ruled in favor of GFIC on the claim for unfair and deceptive trade practices was because Defendants

failed to adequately defend him against the fraud claims at the summary judgment stage. (Plt's. Br. 26–27.) In Fleming's view, due to the alleged "deficient representation," the only arguments Fleming could make to defend himself at the trial stage of the case were futile. (Plt's. Br. 27.)

90. Under North Carolina law, "[u]nfair methods of competition in or affecting commerce, and unfair deceptive acts or practices in or affecting commerce, are . . . unlawful." *Gen. Fid. Ins. Co.*, 269 N.C. App. at 190–91 (quoting N.C.G.S. § 75-1.1(a).) The three elements that a plaintiff must show to establish a claim for unfair and deceptive trade practices are: (i) an unfair or deceptive act, (ii) in or affecting commerce, (iii) that proximately caused injury to the plaintiff. *Pleasant Valley Promenade v. Lechmere, Inc.*, 120 N.C. App. 650, 664 (1995).

91. The Court of Appeals upheld the trial court's judgment that Fleming violated N.C.G.S. § 75-1.1 and found that the trebling of damages was proper pursuant to § 75-16. It observed that Fleming had conceded during the trial that "because the trial court had already granted summary judgment on the issue of fraud and injury to [GFIC], the only remaining issue . . . was whether the conduct at issue was 'in or affecting commerce.'" *Gen. Fid. Ins. Co.*, 269 N.C. App. at 191 (internal quotation omitted). It then rejected Fleming's argument that, as a matter of law, transfer of WFT's assets in contravention of GFIC's rights as a creditor did not affect commerce. *Id.* at 192. Instead, the Court of Appeals agreed with the trial court that, if Fleming's logic prevailed it "would allow corporate entities . . . to incur debts, be subject to judgments, and yet freely transfer assets to other entities in order to avoid

payment of those obligations" and that such actions "would totally erode the marketplace . . . ." *Id.*

92.     In the instant case, the undisputed facts show that Fleming is personally liable for constructive fraud, breach of fiduciary duty, and constructive fraudulent transfer. Accordingly, as the Court of Appeals held in the Underlying Action, "the only remaining issue for the trial court [is] whether the conduct at issue was in or affecting commerce." *Gen. Fid. Ins. Co.*, 269 N.C. App. at 191 (inner quotations omitted).

93.     With respect to matters of law, this Court is bound by the decisions of the Court of Appeals. *See Musi v. Town of Shallotte*, 200 N.C. App. 379, 383 (2009) (under the judicial policy of *stare decisis*, a point of law by a court will generally be followed by a court of the same or lower rank). And the Court of Appeals has determined that Fleming's actions were "in or affecting commerce" under N.C.G.S. § 75-1.1(a). *See Gen. Fid. Ins. Co.*, 269 N.C. App. at 192 (holding the asset transfer that "prevented [GFIC] from enforcing its judgment against WFT . . . had a harmful effect on commerce"). While the Court of Appeals confined its analysis to Fleming's transfer of assets to BMI, the same analysis applies equally to Fleming's transfer of WFT assets to himself or to third parties for his personal benefit. The Court of Appeals' holding in the Underlying Action sets forth the binding law of the instant case. The fraudulent transfers by Fleming seeking to avoid WFT's creditor negatively affects commerce and constitutes violations of this State's Unfair and Deceptive Trade Practices Act. *Id.* at 191–92.

94.     Given the evidence, Fleming could not have prevailed on the Chapter 75 claim below, and he has presented no triable issue of fact with respect to proximate cause here.  Accordingly, his claim for malpractice on this basis fails.

## VI.    CONCLUSION

95.     The undisputed facts show that Fleming was liable to GFIC for breach of fiduciary duty, constructive fraud, constructive fraudulent transfer, and unfair and deceptive trade practices. Piercing the corporate veil was appropriate as a matter of law.  Having failed to demonstrate that there is a genuine issue of material fact with respect to proximate cause, Defendants' Motion for Summary Judgment with respect to Fleming's claim for legal malpractice must be GRANTED.  Plaintiff's claim is dismissed with prejudice.

This the 24th day of May, 2022.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases